FILED & JUDGMENT ENTERED
Steven T. Salata

Jun 11 2013

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

J. Craig Whitley
United States Bankruptcy Judge

| | |
|---|---|
| IN RE: ) | |
| ) | |
| GREGORY SHERWOOD MORRIS ) | Case No. 12-31633 |
| ) | Chapter 7 |
| Debtor. ) | |
| ) | |

## ORDER DENYING EXEMPTION CLAIM

THIS MATTER is before this Court upon the Trustee's Objection to Debtor's Exemption Election, filed October 12, 2012. The Debtor, Gregory Morris ("Morris") filed a response on February 12, 2013, and a hearing was held on March 7, 2013. Wayne Sigmon appeared on behalf of the Trustee and David Badger appeared on behalf of Morris.

For the reasons stated below, the Trustee's Objection to Debtor's Exemption Election is **SUSTAINED**.

### JURISDICTION

The Court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C. §§151, 157, 1334, and the General Order of Reference entered by the United States District Court for the Western District of North Carolina on July 30, 1984. This is a core proceeding within the meaning of 28 U.S.C. §157(b).

1

**PROCEDURAL HISTORY AND FINDINGS OF FACT**

I.  **Background and Pre-Bankruptcy**

Greg Morris is regional director for the financial group of a large insurance company. With an income of some $275,000 per year,[1] Morris lived comfortably and never imagined that he would ever file bankruptcy.  However, in 2006, Morris speculated in the then booming real estate market, purchasing four building lots in several resort developments.  He financed each property with promissory notes secured by the lots.  Instead of reaping the large, short-term gains Morris anticipated from his investments, in 2008, the real estate market collapsed, the developments failed, and the lots became unsellable.  In March 2009, Morris hired attorney David Badger, ("Badger") to negotiate with his lenders and formulate asset-planning strategies to protect Morris and his nonworking spouse, Elaine.

Over the next three years, Badger negotiated deeds in lieu and release agreements with three of Morris' mortgage lenders.  However, an impasse was reached with the fourth lender, Wells Fargo.  Unlike the others, Wells Fargo insisted on full payment of its $300,000 debt.  As a result, on July 5, 2012, Morris filed Chapter 7 bankruptcy in this judicial district.  According to Badger, Wells Fargo was not just the motivation behind Morris filing bankruptcy; it was also his only remaining creditor.[2]

With three years to prepare, by the Petition Date, Morris had fully implemented his asset planning strategies, including one designed to qualify for the North Carolina state law wage

---

[1] Morris' 2012 W-2 Income was $256,310.24.  The Trustee submitted a copy of Morris' W-2 at hearing, marked as Trustee's Exhibit C.

[2] This was a slight overstatement by counsel.  Morris also owed a home mortgage loan.  He intends to reaffirm that debt and continue making the $2,060.29 per month payments.  A separate $80,000 mortgage deficiency claim also appears in his schedules, presumably relating to one of the investment properties.  This debt may have been settled before bankruptcy but was listed out of an abundance of caution.  A small, unpaid debt for homeowner dues is also scheduled petition, as are some property taxes.  Being secured obligations, they stand to be paid by Morris after bankruptcy.

2

exemption, N.C. Gen. Stat. §1-362. That statutory provision permits a debtor to "exempt from the reach of his creditors any earnings for his personal services earned within sixty (60) days preceding an execution order…when it appears, by the debtor's affidavit or otherwise, that these earnings are necessary for the use of a family supported wholly or partly by his labor." N.C. Gen. Stat. §1-362 (2013).[3]

Shortly before filing bankruptcy Morris created a money market account at BB&T into which he deposited several of his paychecks: May 17, 2012 ($1,657.57), May 31, 2012 ($13,621.81), June 14, 2012 ($1,878.55), and June 28, 2012 ($19,212.01). At the petition date, the account contained $37,069.94 of sixty (60) day wages and interest accruals.[4]

In his petition, Morris claimed that $37,069.94 exempt under §1-362. Schedule C, July 5, 2012, ECF No. 1 at 25. The Trustee objected, arguing that these monies were not necessary to the support of Morris and his wife Elaine.

Morris is 60 years old. Elaine is a fifty-nine (59) year old homemaker.

**II.     Income & Expenses**

At the petition date, Morris had a monthly salary of $24,431.61, meaning an annual salary of $293,179.32.[5] Schedule I, July 5, 2012, ECF No. 1 at 35. Morris' take-home pay was much less, $13,681.72 per month. *Id.* The large delta between Morris' gross and net income is attributable not just to tax and social security withholdings, but an additional $3,081.98 per month in voluntary contributions to Morris' three retirement plans: $1,117.11 per month to a 401(K) plan, $1,074.39 to a Roth 401(K) plan, and $890.48 to Roth CUP plan. *Id.* at 36.

---

[3] While the statute contemplates a state law execution, the provision has been applied in any number of bankruptcy cases.

[4] Upon closer review of the paycheck stubs, it was discovered that the paycheck dated May 17, 2012 covered the period of 4/28/12 – 5/5/12. Because the petition was filed July 5, 2012, half of the net pay from that paycheck would have been earned outside of sixty days and would not be exempt. Morris conceded that $828.79 earned 4/28/12 – 5/5/12 is therefore non-exempt.

[5] As of the July 5, 2012 filing date, Morris had already earned $167,000 year to date.

Meanwhile, in his Petition, Morris reported monthly expenses of $11,271.29. Schedule J, July 5, 2012, ECF No. 1 at 37. Among these recurrent obligations, Morris listed a $2,060 mortgage payment; $1,500 for food, $1,600 for life insurance, $700 for health insurance, $700 for transportation (excluding car payments), $600 for home maintenance, $600 in medical expenses, $1,020 of "other expenses" (including $300 for pet care, $500 for attorneys fees. and $200 miscellaneous), and $300 for recreation, clubs and entertainment, newspapers, and magazines. *Id.* Morris also attested to making charitable contributions of $1,000 per month. *Id.*

Even with all of these withholdings and expenditures, at the Petition Date, Morris enjoyed a net monthly surplus of $2,410.43, which translates to $29,297.16 per annum. *Id.*

In his Response to the Trustee's Objection, Morris suggests that his financial circumstances worsened after bankruptcy. At this point, seven months after bankruptcy, Morris projected his 2013 gross income to be only $14,583.00 per month. Debtor's Response to Trustee's Objection to Exemptions, February 12, 2013, ECF No. 25-1 at 4. Morris testified that his income fluctuates based upon sales of two insurance products – Disability Insurance and Long Term Care Insurance ("LTC"). At the end of 2012, his employer notified him that due to changes in the insurer's LTC policies, he should expect significant pay reductions in 2013. Thus, Morris estimates that his 2013 annual gross salary will be only $175,000. *Id.*

Meanwhile, Morris testified at the March 7 hearing that his monthly expenses had actually increased: $11,271.29 per month at the petition date up to a projected $13,562.29 per month in 2013. These additional expenses include a new $646 per month car payment and an increased 401(k) contribution of $1,875 per month (up from $1,117.11 at the filing date). Morris also anticipates extraordinary family expenses in 2013 totaling $32,500. These include cataract surgery ($6,000), carpet replacement ($12,000); replacement suits for work ($1,500), window

4

replacement ($7,000), kitchen repairs ($2,000), and a catch up of the HOA dues and property taxes listed in his petition, which pertain to his Residence ($4,000). *Id.*

### III. Assets

As a result of his asset planning strategies, Morris owned few **nonexempt** assets at the Petition Date; however, he and his wife owned significant levels of **exempt** assets. Apart from the $37,069.94 in contest today, the Morris's own a tenancy by the entireties residence having a tax value of $551,800 in which they have apparent equity of $289,022. Morris intends to reaffirm the $262,778 residential mortgage. Since he paid most joint debts prior to bankruptcy using nonexempt funds, that equity will likely be retained by the Morrises free of creditors claims.

Morris also has the aforementioned retirement accounts. Not only was Morris saving almost $3,100 per month in these retirement accounts when he filed bankruptcy, he had already amassed $443,515 of such savings. *See* Schedule C, ECF No. 1 at 26. (Guardian Ins. Annuity- $252,878; Mass Mutual 401k- $114,384.28; MassMutual Pension Plan- $75,929; Unam Group Pension Plan- $324). These accounts are also exempt. *See Patterson v. Shumate*, 504 U.S. 753, 765 (1992).

Similarly, Morris owns a whole life insurance policy, which, at the petition date, had a cash surrender value of $24,107 and a death benefit of $250,000. Schedule C, ECF No. 1 at 25. Morris' wife, Elaine, is the beneficiary under the life insurance policy, so both would appear to be exempt, per N.C. Const. art. X, §5 and N.C. Gen. Stat. 1C-1601(a)(6) (2013).

Morris also own and has exempted a $4000 Rolex watch.

Immediately after filing bankruptcy, Morris bought a new $35,000 Lexus automobile to replace his old Tahoe. Morris financed this purchase, from which the new $646 per month car payment included in his amended expense budget stems.

Meanwhile, Elaine Morris possesses savings in her name of at least $36,653.[6] That asset derives from Morris evenly dividing a joint bank account with his nonworking spouse prior filing bankruptcy.

### IV.    Prepetition Transfers

Morris made several, large transfers in the months leading up to bankruptcy. Two weeks before filing, Morris paid a total of $6,390.91 to catch up three years of property taxes - on properties that he planned to surrender. While he tried to explain these payments as his response to garnishment threats, his explanation was unconvincing. Obviously, these payments were part of his asset protection strategies. There is no doubt that Morris paid these particular debts because his non-filing spouse was liable for the taxes; existence of a joint debt at the bankruptcy date would enable the trustee to sell Morris' residence (and reach the equity in this otherwise exempt tenancy by the entireties property). The Morrises benefitted by "spending" these nonexempt assets.

In like measure, Morris prepaid several insurance premiums before bankruptcy using nonexempt assets. On March 31, 2012, Morris paid an $8,263.21 annual premium on his Berkshire long-term care policy. The next day, Morris paid an $8,384.13 annual premium on a $250,000 Guardian whole life insurance policy on which his wife was the beneficiary. On April 23, 2012, Morris paid a $3,550 annual premium on a $1,000,000 face value Genworth term life insurance policy on which his wife was the beneficiary.[7]

---

[6] Elaine's asset holdings were not a part of the record.
[7] The Trustee submitted copies of these checks at hearing, marked as Trustee's Exhibits H-J.

At hearing, Morris stated that he previously had paid the premiums on these three policies in monthly installments. Since most of the policy years on these accounts lay beyond the filing date, by paying in advance, Morris obtained post-petition insurance coverage for his family using prepetition funds (that otherwise would have gone to creditors). In the case of the whole life policy, the exempt cash surrender value of the policy was increased by his prepayment.

Finally, on April 16, 2012, Morris wrote a check to North Carolina State University for $1,659.00. Morris scheduled that transfer as a charitable donation, however, at hearing it was established that this transfer paid for season football tickets: another post petition debtor benefit paid for with nonexempt prepetition assets.

## DISCUSSION

I must first clarify what is and is not to be decided today. The present question is not whether Morris requires bankruptcy relief; no one has sought to dismiss his case, convert his case to Chapter 13, or attack these transfers. Both sides appear to believe the Section 707 "means test" to be inapplicable. While the Trustee has obtained an extension of time to object to Morris' discharge, to date no such objection has been filed. The sole question to be decided is whether Morris qualifies for the §1-362 wage exemption.

### I. The N.C.G.S. §1-362 Exemption

To successfully claim a §1-362 exemption, a bankruptcy debtor must make three showings: (1) the monies were earnings for personal services, (2) they were earned within the sixty (60) days preceding the execution,[8] and (3) the monies are necessary for the support of the debtor's family. *In re Kuebler,* 2010 Bankr. WL 2540298, at *2 (Bankr. W.D.N.C. June 24, 2010) (*citing In re Dutton,* 2003 WL 1964192, at *1 (Bankr. M.D.N.C. Apr. 24, 2003)). The

---

[8] A bankruptcy filing has the legal effect of a judgment execution under 11 U.S.C. §544.

7

debtor has the burden of demonstrating these elements by competent evidence. A bare allegation that certain wages are necessary to support the debtor's family is insufficient. *In re Turner,* 2012 WL 4341311, at *2 (Bankr. E.D.N.C. Sept. 21, 2012).

Here, the first two elements are not at issue. Both sides acknowledge that the $37,069.94 balance in the BB&T account derives from Morris' personal services (his salary). Both agree these monies were earned within sixty (60) days of his filing bankruptcy.

At issue is the third element: whether these monies are necessary for the support of Morris' family. Morris contends they are, focusing on his family's projected 2013 budget and his future retirement needs. The Trustee disagrees. Given Morris' high-income level, monthly budgetary surplus, high, if not extravagant, expense levels, and his significant amounts of exempt assets, the Trustee believes these monies are not in any way necessary to support Morris and his wife. Further, the Trustee believes the appropriate measuring point of necessity is the petition date, not the hearing date or points further into the future.

### A. What is "Necessary" is Determined at the Date of the Petition.

This exemption claim was asserted in the bankruptcy petition filed July 5, 2012. See Schedule C, July 5, 2012, ECF No. 1 at 25. To permit an investigation of Morris' affairs, the parties consented to extensions of the applicable deadlines and of the hearing. Thus, the Trustee's objection was not filed until October 17, 2012. ECF. No. 12. Morris' response, including his amended pro forma budget, was not lodged until February 2, 2013. ECF. No. 25. The hearing was held on March 7, 2013, eight months after Morris filed bankruptcy. As described above, there are significant differences in Morris' finances at the hearing date and those present at the petition date.

This begs the question of which point in time the necessity question should be measured.

8

This Court concludes it is the Petition Date.

Under the Bankruptcy Code, the petition date is the primary demarcation point in a Chapter 7 case. The bankruptcy estate is created upon the filing of the Chapter 7 petition. Generally speaking, that estate is comprised of the debtor's legal and equitable interests in property owned *at the petition date. In re Cunningham,* 513 F.3d 318, 323 (1st Cir. 2008) (emphasis added). The exemptions available to a debtor are those in force *at the petition date*. *In re John Taylor Co.,* 935 F.2d 75, 78 (5th Cir. 1991) (emphasis added).

The federal policy is congruent with the state statute. N.C. Gen. Stat. §1-362[9] speaks to the debtor's condition at the time the exemption is invoked. It requires that a debtor demonstrate the earnings "are necessary" to his family's support, not that they *may or will become necessary*. Further, §1-362 is an exemption employed by judgment debtors in response to execution by their judgment creditors. This provision does not categorically exempt all wages from creditor claims. Rather, the exemption is based upon demonstrated need at the time of the execution. Because a judgment is effective for ten years[10] and may be renewed for another ten years,[11] a creditor may execute several times over its life. Thus, to be effective, a wage exemption claim would have to be asserted, and the elements established, at the time of each such execution. A "present financial circumstances" focus is therefore consistent with the nature of the state exemption.

This Court holds that the Morris's financial needs should be evaluated at the point of execution, which in this case, is the Petition Date, not at future points ranging from eight months to decades beyond bankruptcy.

---

[9] North Carolina is an "opt out" state, thus the state exemptions apply in Morris' case. *See* N.C. Gen. Stat. §1C-1601(f) (2013).
[10] N.C. Gen. Stat. § 1-234 (2013)
[11] N.C. Gen. Stat §1-47(1) (2013).

9

### B. What is "Necessary" is interpreted based upon its "plain meaning" in light of the general purpose of exemptions.

What is "necessary" to the support of a debtor's family is not specified in §1-362. The question has received no serious treatment in the case law. We must therefore interpret this statute based upon its " plain meaning" and in light of the general purposes of exemptions. *See In re Coleman,* 426 F.3d 719, 725 (4th Cir.2005).

The Merriam-Webster dictionary defines "necessary" as meaning "absolutely needed." Merriam-Webster Online, www.merriam-webster.com/dictionary/necessary (2013) (accessed May 20, 2013). This common definition of "necessary" is congruent with the general purpose of exemption laws. As our Circuit has stated, the purpose of exemptions is to "protect a debtor from his creditors and to provide him *with the basic necessities of life* so that even if his creditors levy on all of his nonexempt property, *the debtor will not be left destitute and a public charge."* *In re Morehead*, 283 F.3d 199, 206 (4th Cir. 2002). (emphasis added).

Morris points out that exemption statutes in North Carolina are to be "liberally construed in favor of the debtor." *In re Williams*, 2009 WL 32173, at *1 (Bankr. E.D.N.C. Jan. 5, 2009). This is true. However, it is also true that "… this general rule of construction is not a license to re-write an exemption statute in order to create an exemption that is outside the language of the statute." *In re Dillon*, 2005 WL 1629923, at *1(Bankr. M.D.N.C. July 8, 2005) (*citing In re Geise*, 992 F.2d 651, 656 (7th Cir. 1993)).

Of particular relevance in the current case, the Fourth Circuit has also cautioned that "necessity" does not equate to "luxury:" "[T]he fresh start guaranteed by bankruptcy, and supported by the exemption scheme, does not entitle a debtor to maintain the lifestyle to which he was accustomed in better times." *Id.* at 207.

The present question is not whether the $37,069.94 in the BB&T account is necessary to

sustain the Morris's desired lifestyle. It is whether these funds are required to provide this couple with the basic necessities of life such they do not become destitute and a charge upon the public.

Under the facts presented, it is clear that these monies are not so necessary.

### II. Morris has not met his Burden of Showing that the Funds are Necessary for the Support of his Family.

At the petition date and as reported in his Schedules, Morris' income exceeded his Schedule J expenses by $2,410.43 per month. In the case of *In re Dutton*, our sister bankruptcy court held that a debtor who was paying his obligations out of current income, with a remaining net monthly surplus of $1,325 did not qualify for the §1-362 exemption because he had the financial capacity to support himself without resort to additional cash assets. 2003 WL 1964192, at *1 (Bankr. M.D.N.C. April 24, 2003).

#### A. Income Surplus

Here, without any consideration of the reasonableness or necessity of his expenditures, Morris has a budgetary surplus of $2,410.43 per month, almost twice the amount seen in *Dutton*. Even using Morris' figures, the BB&T funds cannot be said to be necessary to his family's support.

Further proof of the Morris's lack of need for these monies is found in the fact that in the months preceding bankruptcy, the Morrises met all of their living expenses, contributed some $3,100 per month to retirement accounts, accumulated $37,069.94 in the BB&T account to create the exemption res, prepaid $20,192.21 of insurance premiums and caught up $6,390.91 of property taxes. While some of these transfers were funded with existing assets, much came out of Morris' current income.

11

### B. Elevated Income

The audacity of Morris' exemption claim becomes even clearer when a close examination is made of his budget. First, Morris had an income of some $275,000 at the petition date. According to his W-2, Morris made $256,310.24 in 2012, six months of which was in the post-petition period. He now asks this Court to assess his need based upon a *projected 2013* income of only $175,000. While the first is the appropriate number, under either of these income figures, Morris and his wife can live well.

The median income for a household of two in Mecklenburg County, NC in the year 2012 was only $50,762.00. United States Census Bureau, State Median Income, www.census.gov/hhes/www/income/data/statemedian, (2012). Morris' Schedule I income of some $275,000, is 540% of the local average; his W-2 2012 income is 500% of the norm. Even at $175,000 per year, Morris makes 325% of what the average family of two subsists on in this area. Yet, he would have this Court believe that he cannot make it without these additional monies. His proposition is ridiculous, at least until one considers how freely Morris disposes of his earnings.

Morris pays his bills and still contributes $3,081.98 per month towards his retirement, meaning $37,000 per year or 12.9% of his Schedule I *gross income*. At hearing, Morris testified that he has recently reduced his level of contributions to $1,875, meaning $22,500 per year. Few Americans are able to save so much for retirement.

One could argue for disposable income purposes under §1325, that some level of retirement contributions is an appropriate expense, particularly for a middle-aged debtor. There are two problems with that contention in this case. First, this postulate assumes that no other resources will be available to the debtor at retirement. That is not the case with this debtor. At

12

the date of bankruptcy, Morris was at least five years from retirement age. At his projected contribution rates he stood to accumulate another $112,500-$185,000, plus earnings in retirement funds. He has already amassed $114,384.28 in a 401(k) account, $252,878.14 in an ERISA qualified annuity, $75,929.21 in a Mass Mutual Pension Plan, and $324.25 in a Unum Group Pension Plan, for a total of $443,515.88. Meanwhile he and his wife are funding long term care insurance which, based on the size of the premiums, will provide a significant, if presently undefined, level of financial support. They also have $289,021.68 of apparent equity in their home. Additionally, Ms. Morris has at least another $36,000 in a savings account. In total, one can identify another $768,537.57 of assets that should be available for the Morris's support in their retirement years plus social security and Medicare benefits. If you include the $250,000 death benefit of life insurance (for which Morris is currently paying $1,600 per month) and long-term care insurance benefits, that number is upwards of $1,018,537.57.

### C. Extraordinary Expenses

Like his income, the Morrises recurrent living expenses are much higher than those typically incurred by bankruptcy debtors. Morris reported estimated monthly expenses of $11,271.29 at the petition date. Schedule J, July 5, 2012, ECF No. 1 at 37. These expenses include a $2,060 mortgage payment and $600 per month home maintenance expense. Throw in allowances for water and sewer, telephone service, cable and internet and Morris spends $3,048 per month to maintain his home. As noted, this is not a §707 "means test" case, but those standards are illuminating as to what Congress and the Internal Revenue Service consider to be appropriate levels of living expenses for debtors. The local IRS standard for housing and utilities for two people is only $1,698.[12] In short, the Morrises spend $1,350 per month for housing and

---

[12] This includes mortgage or rent, property taxes, interest, insurance, maintenance, repairs, gas, electric, water, heating oil, garbage collection, residential telephone service, cell phone service, cable television,

utilities more than what is considered to necessary.

Similarly, the Morrises spend $2,620.00 for food ($1,500), clothing ($200), and other items (including $300 for pet care, $300.00 for recreation, and $200.00 for undefined "emergencies."). By comparison, the 2012 IRS Standard monthly expense allowance for food, clothing and other items for a household of two in this area is $1,053.00.[13] The Morrises spend more than double the norm.

Morris attempted to justify some of these elevated expenses at hearing. In particular, he testified that his food budget of $1,500 includes some unreimbursed business meals and expenses for his wife's parents. Similarly, he says his family's transportation costs are higher than normal because his wife sometimes travels to her parents' home to assist them. However, no evidence was presented that could support a finding that his wife's parents are Morris' dependents and the additional expenses weren't quantified.

Morris' budget includes several other line items that appear unnecessarily high or overstated. Returning to the life insurance matter, Morris indicates that he pays $1,600 per month to maintain life insurance and long term care insurance policies. Since Morris prepaid the annual premiums on these policies before bankruptcy, there is no reason to budget them for a second payment in Schedule J.

As noted above, while saving for retirement is prudent, Morris appears to have over provided for his and Elaine's golden years. Their sizeable exempt assets, the ongoing monthly retirement savings, their $250,000 of life insurance, and their long term care insurance all meet the same general goal, the Morris's post-retirement support. Actually, Morris appears to be

---

and internet service. http://www.irs.gov/Businesses/Small-Businesses-&-Self-Employed/North-Carolina---Local-Standards:-Housing-and-Utilities. (accessed April 1, 2013).

[13] This includes food, housekeeping supplies, apparel and services, personal care products and services, and miscellaneous expenses. IRS, Collection Financial Standards, http://www.irs.gov/Individuals/Collection-Financial-Standards. (accessed April 1, 2013).

14

providing for the couple's retirement several times over. These financial assets come at a significant cost: monthly retirement contributions of $3,081.98; a monthly life insurance premium of $1,600; an annual long term care insurance premium of $8,263.21, and some portion of the $2,060.29 mortgage payment. One is left with the impression that the Morrises are over budgeting in an effort to absorb all of their current income and make the case for this exemption.

Finally, several other monthly expense items appear on their face to be excessive: $700 for transportation expenses (exclusive of Morris' new $646 car payment), $600 of medical expenses, and $1,020 of other expenses (including $300 for pet care, $500 for attorneys fees,[14] and $200 miscellaneous) and $300 for recreation, clubs and entertainment, newspapers, and magazines.

In short, Morris' budget contains excessive expenditures. His monthly income surplus is much higher than the $2,400 stated in Schedules I & J. With such a surplus, the BB&T funds cannot be considered necessary to the Morris' basic needs.

### D. Charitable Contributions

Subject to certain restrictions, the bankruptcy laws permit charitable giving by debtors. *See e.g.*, 11 USC §1325(b)(2)(A). However, and again, the present inquiry is not under the Bankruptcy Code. The question is whether under this state statute, the BB&T account funds are "necessary" to provide the Morrises with the basic necessities of life. In this context, both a debtor's ability to make charitable gifts and the amounts of those gifts are relevant.

In Schedule J, Morris first attested to making charitable contributions of $1,000.00 per month. In his statement of financial affairs, Morris indicated a somewhat higher level of charitable giving. There, he revealed transfers in the year prior to bankruptcy of $200 per week

---

[14] To defend against the Trustee's objection to exemptions and to continue to negotiate with Wells Fargo, an ostensibly dischargeable debt.

15

to his church, plus a $1,000 donation to the Kidney Foundation and a $1,500 contribution to the N.C. State Student Association. When asked about these transfers at hearing, Morris stated he returned to the $1,000 per month number for church tithing, and $1,200 per year to N.C. State.

The tithe appears to be a legitimate charitable contribution, if a very large one for a person exiting Chapter 7. That Morris is able to make gifts of this amount contradicts his position that the $37,000 in the BB&T account is necessary to his family's support.

As to the N.C. State "contribution," at hearing, Morris was presented with a cancelled check of $1,659 dated April 16, 2012. This check was cashed, but not by the N.C. State Student Association, but by the "N.C. State Athletics Ticket Office." It purchased season football tickets. Obviously, someone who can afford to purchase season college football tickets shortly before filing bankruptcy is already covering the basic necessities of life.

## CONCLUSION

One can question whether Morris requires bankruptcy relief whatsoever, given his high levels of income as compared to the few obligations that he seeks to discharge. That question is not before this Court. N.C.G.S. §1-362 is intended to help a debtor to afford basic necessities of life. Neither it, nor any other exemption, is meant to secure for a debtor his former social status or his former affluent lifestyle. Clearly, that is what Morris has in mind when he argues that these monies are "necessary" to his family's support. Between his substantial income and sizeable nonexempt assets, Morris is living at levels at which most people can only dream. If he was concerned about future decreases in his income, Morris should have reined in his lifestyle and reduced his living expenses; instead he has actually increased them. This is not a case of

need but of greed.[15]

The $37,069.94 in the BB&T account is not "necessary for the support" of Morris' family under §1-362, and the exemption is **DENIED**. Morris shall immediately turn over to his Trustee the $37,060.94 fund balance in the BB&T account, and any accrued interest thereon.

**SO ORDERED.**

This Order has been signed electronically.        United States Bankruptcy Court
The judge's signature and the court's seal
appear at the top of the Order.

---

[15] Even if we use 2013 as the measuring point of the Morrises finances as he suggests, the BB&T funds are still not necessary for the support of his family. These numbers are found in Morris' budget (Exhibits A and B of his affidavit). The primary difference between this budget and that represented by Schedules I and J to his Petition is that Morris reduces his anticipated gross income from $24,431.61 to $14,583.00 per month beginning approximately six months post-petition. That reduction in pay appears unwarranted and demonstrates the difficulty in projecting financial needs very far beyond the present. He also projected his living expenses to rise from $11,271.29 to $13,562.29 per month. Even by his numbers, Morris is showing a budget surplus, is subsisting on his current salary, and therefore does not require the §1-362 exemption. His expense budget, like his Schedule J budget, contains thousands of dollars of excessive and/or unnecessary expenses.

As to Morris' suggestion that he anticipates extraordinary expenses of $32,500 in 2013, the Court discounts that unsubstantiated parole testimony as unreliable. Much of these appear to be more double counting (e.g., Morris' suggestion that his 15 year old house which he maintains at the rate of $600/month (Schedule J) needs $21,000 in extraordinary repairs).

17